# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-14411-CIV-MAYNARD

ERICK M. ANDERSON,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,

    Defendant.

_____/

FILED by _____ D.C.

AUG 2 3 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT (DE 12 & 13)

**THIS CAUSE** comes before this Court upon the above Motions. Having reviewed the Motions, the responsive pleadings, and the Administrative Record, and having held a hearing thereon on August 21, 2018, this Court finds as follows:

### BACKGROUND

1. The Plaintiff applied for Title II disability insurance benefits under the Social Security Act in November 2013. The application was denied initially and after reconsideration. On August 30, 2016, following a hearing, an Administrative Law Judge ("ALJ") rendered a decision finding the Plaintiff not disabled under the terms of the Act. The Appeals Council denied his Request for Review on September 25, 2017, thereby leaving the ALJ's decision final and subject to judicial review.

2. From 1995 to 2007 the Plaintiff worked in various administrative roles for his mother's nursing agency business. In August 2008 he received a nursing degree and became an RN. He had various RN jobs thereafter. As of June 2013 he was working two different managerial-level nursing jobs at the same time.

3. The Plaintiff reports a lifelong history of depression and substance abuse, with a more recent diagnosis of bipolar disorder. He started drinking heavier after his father passed away in November 2011 but remained functional and employed. Not only was he drinking more but he also was taking anti-depressant medication. He was in a motor vehicle accident in October 2012 for which he was charged with DUI and hit-and-run. He entered intensive substance abuse rehabilitation after that and has stayed sober ever since. The criminal charges remained pending for the next several years.

4. On June 14, 2013 his stepson was murdered in front of the family home. The attacker was a family acquaintance who stabbed his stepson over a dispute about a girl. The Plaintiff was home at the time, and he found his stepson after a neighbor alerted him about an injured person outside. The Plaintiff administered first aid and resuscitative measures but was unable to save him. The death happened near both Father's Day and the Plaintiff's birthday. The Plaintiff claims Post-Traumatic Stress

Disorder ("PTSD") from this event. It rendered him unable to continue to work, and he claims the day of the murder, June 14, 2013, as his date last worked. The murder also caused his wife to stop working, and she began receiving a disability benefit based on it (and on foot surgery).

5.    The medical record begins a month after the murder. The Plaintiff went to the New Horizons mental health clinic in New York where he lived. The Plaintiff reported PTSD-type symptoms such as mood swings, depression, anxiety, poor sleep, and irritability. He also reported overall poor emotional regulation. The mental status examination was normal. The attendant, Dr. Raagas, diagnosed bipolar disorder, poly-substance dependence, and PTSD. Dr. Raagas noted the presence of moderate stressors, and she gave a GAF score of 60. Dr. Raagas placed the Plaintiff on an aftercare therapy plan to supplement the care that another clinician, Dr. Lebowitz, was to provide. Seroquel was prescribed.

6.    Other than the two initial visits in July 2013, the record contains no treatment notes from the New Horizons clinic, either of the therapy that Dr. Raagas was to provided or of the treatment that Dr. Lebowitz was to provided. The only other record from the New Horizons clinic is a Mental Impairment Questionnaire that Dr. Raagas filled out on January 7, 2014.

There Dr. Raagas noted the Plaintiff's report of such work-related impairments as poor concentration, agitation, flashbacks, and social isolation/withdrawal. Dr. Raagas rated the Plaintiff as markedly impaired in his ability to perform a variety of work-related functions and tasks; is incapable of even low stress work; and would miss more than three days of work a month. (The questionnaire begins at page 220 in the Administrative Record.)

7.    In February 2014 the Plaintiff and his family moved from New York City to Florida. The purpose of the move was to help him stay in substance abuse remission and to ease his PTSD symptoms. The Plaintiff still was on FMLA leave from his employer. He was 41 years old at this time.

8.    The Plaintiff returned to New York on April 3, 2014 for a consultative mental health evaluation with Dr. Massey. The Plaintiff reported that his stepson's murder both had worsened his pre-existing mental health condition and had caused many new mental health symptoms. (It does not appear that the Plaintiff reported to Dr. Massey his move to Florida.) The mental status examination was overall normal except for mild distractibility. Dr. Massey gave the diagnoses of major depressive disorder, severe; PTSD; and poly-substance abuse in remission. Dr. Massey opined that the Plaintiff's anxiety and depression hinder social

interaction---while also noting the Plaintiff's active family involvement and active participation in various support groups. Dr. Massey furthered that the Plaintiff's anxiety and depression impair his ability to manage stress and moderately impair his ability to perform complex tasks. However the Plaintiff remains capable of maintaining a regular schedule. (Dr. Massey's report begins at page 241 of the Administrative Record.)

9.    In May 2014 the Plaintiff began seeing ARNP Susan Nelson in Florida. Treatment consisted of regular therapy sessions and Seroquel refills.

10.    The Plaintiff's disability application had been denied at the initial levels of review, and that denial prompted him to begin pursuing the reinstatement of his nursing license in Florida. To that end he joined the Impaired Nurses Program to increase the chance of approval. He also began working out at the gym. He took his family to Disney World. He and his wife went on a cruise, and despite concerns, the cruise vacation did not affect his sobriety. He was active in support groups. By July 2014 his primary sources of stress were money and the restoration of his nursing license.

11.    The Impaired Nurses Program sent the Plaintiff to Dr. Smolen for an addiction evaluation on July 29, 2014. At that appointment he reported the successful completion of intensive

substance abuse rehabilitation after the October 2012 car
accident. He reported current mental health treatment with ARNP
Nelson. He reported Dr. Furman as his primary care physician
(although the Administrative Record contains no treatment notes
from a Dr. Furman, this Court notes). He denied any current
depression or suicidal ideation. He asserted ongoing sobriety
even without full AA participation. PTSD and grief remained his
primary complaints (although substantially improved). He was
awaiting his treatment team to declare him fit for nursing. He
wanted reinstatement of his nursing license even though he did
not feel personally ready to return to nursing yet. He was
interested in working in the substance abuse field or in the
ministry. The mental status examination was normal. Dr. Smolen
diagnosed PTSD and gave a GAF score of 60. Given the Plaintiff's
lack of active AA participation and ongoing PTSD complaints, Dr.
Smolen did not declare the Plaintiff ready to return to nursing.
He advised the Plaintiff to pursue substance use monitoring,
active mental health treatment, and mental health testing.

12. The Plaintiff continued to travel up north. He took
his two children with his previous wife back to Pennsylvania to
their mother after having them for the summer. He returned
several times thereafter as he sought full custody of them. In
September 2014 his DUI charge was settled. The murder trial

remained on hold. At home he was active in various support and substance abuse groups, and he was active in his church. By the end of 2014 he had bought a large family home and was fixing it up. He was rehearsing for a play. His wife was starting a business. The Plaintiff's primary complaint at this point was the stress from taking on too much.

13. Soon thereafter the Plaintiff was granted full custody of his first two children, and his primary complaint in 2015 was managing the process of settling his blended family in together. The Plaintiff focused on his family and taking charge of that process.

14. In March 2015 ARNP Nelson filled out a Mental Impairment Questionnaire and narrative report (which begins at page 297 of the Administrative Record). ARNP Nelson gave the diagnoses of alcohol dependence in remission, bipolar disorder, and PTSD for which the Plaintiff was being treated with Seroquel medication and psychotherapy. She reported the symptoms of mood disturbance (irritability), manic symptoms (such as impulsivity and grandiose thoughts), and intrusive thoughts (with associated insomnia). She described these symptoms as significant for PTSD. She rated the Plaintiff's ability to work in a coordinated manner and to get along with co-workers as markedly impaired, and she rated several other mental work tasks as either

moderately or moderately-to-markedly impaired. She added that the Plaintiff will miss two to three days of work a month. ARNP Nelson explained that PTSD takes years to deal with and that the Plaintiff "is unable to work at this time because of above symptoms." "He is limited at this time in being able to work in nursing", ARNP Nelson added.

15. The focus of ARNP Nelson's subsequent treatment notes remained on the Plaintiff's stress from settling his blending family in together. The whole family now was seeing a family therapist. The Plaintiff complained of the occasional loss of patience and poor money management. He was dissuaded from an unrealistic house-flipping idea. That May the Plaintiff drove himself back to New York to be with his mother for her back surgery.

16. On May 8, 2015 his case manager at the Impaired Nurses Program wrote him a letter about the status of his Florida nursing license. The case manager acknowledged his treatment compliance but did not approve his return to nursing. For that to happen, the case manager advised, the Plaintiff's treatment providers much give their support and the Plaintiff must pass a duty fitness evaluation.

17. Five days later, on May 13th, LMHC Koves of the SequelCare of Florida mental health clinic prepared a

Biopsychosocial Assessment and Initial Treatment Plan. The Plaintiff had gone there on his own referral. He reported a history of (but no current) mood disturbance symptoms of agitation and irritability. He also complained of intrusive thoughts, anxiety, and poor focus. He claimed a depressed mood from his various stressors. Nevertheless he remains active in his church and various support groups, and he exercises at the gym regularly. The mental status examination was normal. Based on the Plaintiff's subjective reports, the attending doctor diagnosed PTSD and bipolar disorder with good prognosis. The attendant gave a GAF score of 55. Grief counseling and anxiety reduction therapy were recommended. Treatment at this facility was limited to therapy sessions with DNP Donna Adair.

18. The Plaintiff continued to see ARNP Nelson on a monthly basis. On May 27th she wrote the Florida Board of Nursing to report that the Plaintiff "has been stable and is very involved in helping himself and his family adjust to the move to Florida." He took his family to New York to visit with his mother and to meet the District Attorney who is prosecuting the murder trial. That trial remained on hold. The Plaintiff was experiencing financial stress but was feeling more motivated to care for his family. He remained active in church and with his different support groups (although personally he saw no need to

continue with AA meetings). In October 2015 the Plaintiff reported that Florida had given him a nursing license. He planned a trip to New York for the holidays.

19. In January 2016 DNP Donna Adair filled out a Mental Impairment Questionnaire (found at page 332 of the Administrative Record). The Plaintiff had seen DNP Adair on a few occasions for therapy in late 2015 and who also prescribed Seroquel. She reported the diagnoses of PTSD and panic disorder. She gave a GAF score of 50 to 55. She noted the symptoms of guilt, panic attacks, labile mood, relationship problems, intrusive recollections, and appetite disturbance. She did not see how the Plaintiff could function at work either mentally or emotionally. Of the various questionnaires of record, she describes the greatest degree of impairment, rating the majority of the listed mental work tasks as markedly impaired.

20. Treatment notes from ARNP Nelson from February 2016 show increasing familial and financial stress along with an increase in anxiety. The Plaintiff also was having difficulty deciding what he wanted to do and setting goals. Although he enjoyed public speaking at his church, he now was doubting his interest in becoming an ordained minister. He had a moment of impulsivity when he allowed a recently divorced friend to move into the family home without consulting with his wife. He soon

corrected the situation, however, and his friend moved to an apartment.

21. In March 2016 ARNP Nelson filled out another Mental Impairment Questionnaire. (This one is found at page 369 of the Administrative Record.) It is identical to the one she filled out a year before.

22. Subsequent treatment notes from ARNP Nelson and DNP Adair show the Plaintiff to be in good spirits and encouraged about his future. He again was excited about becoming a minister and excited to start his own business. He was planning a second cruise with his wife. ARNP Nelson suggested less frequent appointments, but the Plaintiff did not feel ready for that yet. The murder trial continued to be delayed, and ARNP Nelson opined that the stress from the trial's delays leave the Plaintiff unable to work. It has made him angry and emotional and prevents him from moving on. He also was experiencing marital strife.

23. On July 8, 2016 the psychiatrist, Dr. Gavin Rose, M.D., conducted an Independent Medical Examination. It does not appear that the Commissioner sent him to this one-time examination but rather it was arranged by the Plaintiff's disability attorney. (Dr. Rose's report begins at page 383 of the Administrative Record.) The Plaintiff described his PTSD symptoms as either resolved or attenuated. He denied any recent

depression or mania. He described himself as unable to work because of social isolation and anticipated difficulty coping with a highly structured and stressful work environment. He reported that he is attempting to get his nursing license reinstated (although the record suggests that that had happened already). The mental status examination was overall normal except for an anxious mood. Testing showed mild to low-moderate anxiety, moderate depression, and moderate guilt. Dr. Rose diagnosed PTSD of mild to moderate severity that precludes employment in the absence of certain accommodations. Dr. Rose noted the presence of stressors, and he gave a GAF score of 51. He described the Plaintiff as having a full range of daily life activities.

24. Dr. Rose also filled out a Mental Impairment Questionnaire. It was the same questionnaire form that ARNP Nelson and DNP Adair had filled out, and his description of the Plaintiff's symptoms was similar to theirs, as well. However his impairment rating was the least restrictive of the three providers. He saw only one mental work-related task that was markedly impaired: performing at a consistent pace. Dr. Rose added that the Plaintiff is unable to work on a sustained, regular basis without accommodation.

25. The ALJ found two medical conditions that qualify as "severe impairments" at Step Two of the disability analysis. The first is bipolar disorder (despite the Plaintiff's own doubts expressed to ARNP Nelson on April 4, 2016 over whether he truly ever had bipolar disorder) and the second is PTSD. The ALJ rejected the Plaintiff's claim that those conditions are wholly disabling, and the ALJ discounted medical opinions[1] that suggest a disabling degree of severity. The ALJ did so based on a few main findings. First the ALJ highlighted the breadth of the Plaintiff's daily life, travel, and other activities, all of which suggest substantial functional ability. Second was the relatively conservative nature of treatment, limited to Seroquel medication and therapy, and its success at relieving the Plaintiff's symptoms. The ALJ therefore found the treating therapists' notes to contradict, rather than support, those same therapists' disability opinions. Thirdly the ALJ found the overall medical record to show a mental health condition less

---

[1] The Administrative Record contains medical opinion statements from a variety of sources. The treating sources of Dr. Raagas, ARNP Nelson, and DNP Adair provided opinion statements. The consultative examining psychologist Dr. Massey provided a report for the Commissioner. Dr. Smolen and Dr. Rose both wrote reports on consultative basis with Dr. Smolen sending his to the nursing board and Dr. Rose sending his to the Plaintiff for use with his disability application. Lastly LMHC Koves wrote an assessment report after making an initial assessment for treating purposes. The ALJ noted all of these opinion statements and reports in her decision. However the ALJ provided a substantive discussion of just the treating sources (Dr. Raagas, ARNP Nelson, and DNP Adair) and of the consultative source, Dr. Massey. The ALJ's discussion of the others' opinion statements was limited to their GAF scores.

impairing than alleged. The ALJ noted the consistently benign mental status examinations and the relatively moderate GAF scores of record that ranged from a low of 50 to a high of 60.

26. Although the ALJ did not see evidence to support full disability, the ALJ still made accommodation for a substantial degree of impairment. The ALJ assessed an RFC that limits the Plaintiff to performing simple tasks and to work that requires "only infrequent and/or superficial interaction with others." That RFC precludes the Plaintiff's return to his past work as a nurse supervisor and general duty nurse. The ALJ next considered the availability of other, more amenable types of jobs. For that determination the ALJ relied on the testimony of the Vocational Expert who also testified at the administrative hearing. Based on the VE's testimony and other sources of vocational information, the ALJ found the Plaintiff able to perform the jobs of a hand packager (who sorts, labels, and seals packages on a conveyer line), a "stores laborer" (who works in a warehouse filling orders, storing items, and occasionally working on an assembly line), and an advertising distributor (who distributes material either house-to-house, to businesses, or on the street). (This Court incorporates the descriptions of these three jobs that the Plaintiff provides in his Reply.) The ALJ therefore concluded that the Plaintiff is not disabled.

## DISCUSSION

27. Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Jordan v. Comm'r, 470 Fed.Appx. 766, 767-68 (11th Cir. 2012).

28. This Court begins with the Plaintiff's objections to the ALJ's consideration of the medical opinion evidence. The Plaintiff argues that the ALJ erred by discounting the RFC

questionnaires that Dr. Raagas, Dr. Nelson, and DNP Adair filled out. Social Security law generally gives the medical opinions[2] of treating sources[3] deference. That does not mean that medical opinion evidence is determinative. An ALJ may discount them, so long as the ALJ articulates good cause for doing so. See generally, Burgos v. Comm'r, 705 Fed.Appx. 794, 802–03 (11th Cir. 2017) (providing a recent statement of the Eleventh Circuit's general rule that an ALJ must give a treating doctor's opinion substantial or considerable weight unless the ALJ shows good cause to give it lesser weight). This Court finds that the ALJ articulated good cause here.

29. The RFC questionnaire that Dr. Raagas filled out is closest in time to the tragic murder of the Plaintiff's stepson, dated half a year after it. There Dr. Raagas noted some areas of marked impairment. However there are very few contemporaneous treatment notes to support that questionnaire. The record contains only the initial evaluation and treatment note and

---

[2] At 20 C.F.R. § 404.1527(a)(1) the Commissioner defines "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." However no deference is given to treating source opinion statements on those issues that the Commissioner reserves for her determination. This includes opinions on a claimant's inability to work or disability as Social Security law defines it. See 20 C.F.R. § 404.1527(d) and SSR 96-5p.

[3] At 20 C.F.R. § 404.1527(a)(2) the Commissioner defines what kind of ongoing treatment relationship makes a doctor a "treating source" to whom deference is given.

nothing contemporaneous to the questionnaire. Lastly Dr. Raagas filled out the questionnaire before the Plaintiff moved to Florida and resumed mental health treatment here. Taken altogether that means Dr. Raagas lacked the insight from an ongoing established treatment history.

30.    Dr. Nelson and to a much lesser extent DNP Adair (who in any event may not count as an acceptable medical source in the first place technically speaking[4]) saw the Plaintiff far more often than Dr. Raagas did. Their treatment notes show the Plaintiff to be generally active and functioning in a variety of settings. Their treatment notes document few symptoms or problems attributed to PTSD. They show treatment limited to management with Seroquel medication and support for general life stressors. That is why their own treatment notes fail to support the severity of their RFC questionnaire answers. This Court finds that the ALJ adequately addressed these points, and consequently this Court sees no reversible error in the ALJ's decision to discount these treating sources' impairment opinions. The doctors seemed to have based their questionnaire answers more on the Plaintiff's subjective reports rather than on their own clinical observations.

---

[4] For a discussion of who counts as an acceptable medical source under Social Security law, see Rea v. Commissioner, 2017 WL 3614385 (S.D.Fla. 2017).

31. This Court addresses next the impairment opinion of Dr. Massey. Dr. Massey does not count as a treating source, and consequently the ALJ did not have the same obligation to state good cause for discounting his opinion statement. Dr. Massey instead was a consultative source who examined the Plaintiff one time. That does not mean Dr. Massey's report does not count as relevant evidence, and for the same reasons discussed above, the ALJ stated good cause for not giving weight to it, either. This Court adds that like Dr. Raagas, Dr. Massey saw the Plaintiff before his move to Florida and thus without the benefit of knowing the course of his treatment after his move.

32. Lastly this Court addresses the RFC questionnaire and opinion statement that Dr. Rose submits. The Plaintiff argues that the ALJ erred by not saying how much weight she gives to Dr. Rose's opinion. That is not to say that the ALJ ignored or overlooked the evidence from Dr. Rose. To the contrary the ALJ discussed it enough to demonstrate her awareness of it. The ALJ even discounted the evidentiary weight of Dr. Rose's GAF score---albeit without expanding that discussion to cover the rest of Dr. Rose's opinions. Although ideally the ALJ should have been more thorough, this Court sees no reversible error on this point. For one, Dr. Rose was not a treating source and therefore not entitled to deference. Dr. Rose was a one-time examiner, but

unlike Dr. Massey, not solicited by the Commissioner but rather by the Plaintiff, himself. The Plaintiff had gone to Dr. Rose for an examination shortly before the administrative hearing.

33. This Court also agrees with the Defendant that even if the ALJ did not expressly address the full extent of Dr. Rose's opinion, the ALJ's overall analysis makes clear that the ALJ implicitly rejected it to the same extent and for the same reasons that the ALJ rejected the other medical opinion statements. The treatment history and the range of the Plaintiff's activities and endeavors simply do not corroborate the presence of marked impairment. This point is most relevant for Dr. Rose because he made his opinion statements at the end of the relevant treatment history and after treatment already had begun to wind down. Indeed the text of his IME report itself is evidence of the substantial improvement in the Plaintiff's mental health and functional ability. Dr. Rose's own narrative report fails to support either the GAF score that he gives or his opinion that the Plaintiff's ability to concentrate is markedly impaired. Even if Tillman v. Comm'r, 559 Fed.Appx. 975 (11th Cir. 2014) and related opinions to which the Defendant cites are not on point, this Court finds their general premise that an error (here, the ALJ's failure to address Dr. Rose's impairment questionnaire) may not warrant a remand when that

error is harmless or otherwise does not justify correction to apply to the circumstances of this case, too.

34. This Court turns next to the Plaintiff's argument that the ALJ improperly evaluated his testimony and discounted his allegation of mental health impairments of disabling severity. The ALJ expressly applied the governing standard of SSR 16—3p for determining the degree to which claimed symptoms and impairments reduce the claimant's functional ability. See generally, Hargress v. Comm'r, 883 F.3d 1302 (11th Cir. 2018) (discussing the SSR 16—3p standard). Having conducted its own independent record review, this Court agrees with the Defendant that the ALJ adequately identified those elements present in this case that contradict, rather than support, the severity of impairment that the Plaintiff claims and adequately explained the basis for this part of the analysis.

35. As the ALJ stressed, the nature of the treatment that the Plaintiff received was relatively conservative in nature. It was limited to Seroquel medication and therapy. To draw a comparison, it was far more conservative in nature than the intensive, inpatient substance abuse rehabilitation treatment that the Plaintiff received after the October 2012 DUI. It is true that the Plaintiff pursued therapy on a regular basis over several years and to that extent it counts as substantial.

However the other part of the AJL's finding was that the treatment received was successful. Treatment notes show few significant symptoms attributed to his PTSD. Social Security law requires more than the presence of a diagnosable condition to prove disability. The condition must manifest disabling impairments, and those impairments must exist despite the pursuit of ameliorating treatment. See Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (stating the general rule that "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling"). It is also true that mental health conditions lack any objectively determinable diagnostic criteria. That increases the importance of trained mental health care providers' opinion and insight. It is not that the ALJ overruled the treating providers' diagnoses, however. It is the fact that the overall evidentiary record simply fails to corroborate a marked degree of impairment of the specific mental work-related tasks that they reported. For a condition to be "disabling" as Social Security law defines that term, the Plaintiff must proffer more than just the diagnosis. The Plaintiff must prove that the diagnosed condition causes work-related impairments and that those impairments are of a disabling severity.

36. The Plaintiff is correct that as a general principle of Social Security law, the participation in daily life activities is not necessarily inconsistent with disability and that a claimant need not be bedridden to meet the standard. However daily life activities are a relevant part of the overall analysis, and this Court sees no error in the ALJ's inclusion of them as a reason to find the Plaintiff not wholly disabled. This Court does not count any particular activity or endeavor against him. To the contrary, the Plaintiff laudably cared for his family after a tragic event. The point is that taken on the whole they still show a range of functional ability greater than either what the treating and examining sources portray in their RFC questionnaires or what the Plaintiff alleged at the hearing. They suggest the ability to concentrate and to interact with others to a level at least equivalent to the RFC that the ALJ assessed.

37. Contrary to the Plaintiff's arguments, the ALJ did give reasons to discount the medical providers' questionnaires and to find the Plaintiff not as impaired as he claims. Moreover as this Court explains above, the evidentiary record supports those reasons that the ALJ gave. The evidentiary record taken on the whole is consistent with the ALJ's reasoning and provides competent, substantial evidence. This Court further notes that

the ALJ did not wholly reject the Plaintiff's claims of mental health impairment. The ALJ still accounted for a substantial degree of impairment in the RFC assessment. This Court therefore finds competent, substantial evidence to support the RFC assessment, as well.

38. This Court now turns to the Plaintiff's objection to the ALJ's vocational finding. The ALJ asked the VE whether there are jobs amenable to a person who "is able to concentrate and persist for simple tasks" and who "is limited to work that requires only infrequent and/or superficial interaction with others". The VE answered that hypothetical by identifying three kinds of jobs and affirmed that the answer is consistent with the Dictionary of Occupational Titles. The Plaintiff's objection is that the ALJ excluded from her question to the VE the moderate degree of concentration impairment that she had found.

39. The Plaintiff's objection refers to the ALJ's earlier finding at Step Two of the disability analysis where the ALJ considered the four broad domains of mental functioning and rated the severity of each. This particular finding is called the Psychiatric Review Technique ("PRT"). At the PRT stage of the analysis the ALJ found the Plaintiff to be moderately impaired in his ability to perform concentration, persistence, and pace (the third broad domain of mental functioning). The ALJ

based that particular rating on Dr. Massey's consultative report. The PRT determination is not the equivalent of the later Step Four RFC assessment, however; the RFC assessment is a more specific determination of work ability. Nevertheless the PRT finding is relevant to the RFC assessment, and Social Security law requires some sort of link, even if implied, between the PRT finding and the RFC assessment. See generally, Syed v. Comm'r, 441 Fed.Appx. 632 (11th Cir. 2011).

40. The ALJ adequately accounted for the PRT in the RFC assessment. At the conclusion of the PRT analysis the ALJ stated that the PRT findings are reflected in the later RFC assessment. Then in that later RFC analysis the ALJ explained how the RFC assessment accounts for concentration-related impairment. The ALJ conceded as "reasonable that the [Plaintiff] would have difficulty with some mental tasks, including . . . maintaining concentration, persistence, or pace", and consequently "[d]ue to diminished concentration" the ALJ limited the Plaintiff "to concentrating and persisting for simple tasks only." Dr. Massey, on whom the ALJ relied in making the PRT finding of moderate concentration impairment, expressly opined that despite the various mental health symptoms and impairments, the Plaintiff remains "able to follow and understand simple directions and perform simple tasks." Likewise the ALJ found that despite his

various mental health symptoms and impairments, the Plaintiff remains capable of performing the mental demands of work to the extent reflected in the RFC assessment. In other words the ALJ did not simply assume that an RFC for simple, routine work accommodates the Plaintiff's concentration-related impairment, and there is evidence that supports the Plaintiff's ability to perform simple, routine work despite his concentration-related impairment. The hypothetical that the ALJ asked the VE is based on that RFC assessment, and consequently the VE took those work-related restrictions into consideration when considering what amenable jobs are available. The ALJ's vocational analysis therefore complies with Social Security law requirements. See Scott v. Comm'r, 495 Fed.Appx. 27 (11th Cir. 2012), Forrester v. Comm'r, 455 Fed.Appx. 899 (11th Cir. 2012), Jarrett v. Comm'r, 422 Fed.Appx. 869 (11th Cir. 2011), and Maffia v. Comm'r, 404 Fed.Appx. 352 (11th Cir. 2010).

## CONCLUSION

41. The Plaintiff experienced a tragic and traumatic event, and that event negatively affected his mental health. At issue here is whether the Plaintiff's mental health condition impairs his ability to perform work-related tasks to the extent that it renders him wholly unable to work, consistent with how Social Security law defines "disability". Or, more accurately

stated, the question before this Court upon judicial review is whether the ALJ's determination that the Plaintiff's mental health conditions, while significant, do not cause a disabling degree of work-related impairments should be affirmed. It is not for this Court upon judicial review to re-weigh the evidence or reach findings of fact anew; such is the responsibility of the ALJ as the fact-finder in this case. This Court's review is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence and that the ALJ's decision comports with the governing law and regulations. Having reviewed the parties' arguments and having independently and carefully reviewed the whole record, this Court finds the decision to have such support, with no grounds warranting reversal or remand.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 12) is **DENIED**. In affirming the ALJ's decision, the Defendant's Motion for Summary Judgment (DE 13) is **GRANTED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 23rd day of August, 2018.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE